RAMSEY *et al. v.* THE STATE.

1. In the cross-examination of a witness who has testified in support of the character and credit of another witness, it is idle and useless to ask the question, "Would you believe him upon his oath if he were to swear to something different from what you did?" To prove that a person would not believe another rather than himself would add nothing to human information.
2. Newly discovered evidence which is of no materiality whatever,

save through its effect in discrediting a witness who testified at the trial, is not cause for a new trial; more especially where there is no affidavit by the movant of diligence in preparing for trial, or of his ignorance of the facts to which the new evidence relates, but only of his ignorance of the newly discovered evidence.

3. The evidence warranted the verdict.          *Judgment affirmed.*

April 27, 1892.  Argued at the last term.

Criminal law. Evidence. Witness. New trial. Before Judge MARTIN. Muscogee superior court. May term, 1891.

Elbert Ramsey and Ed. Marion were found guilty of an assault with intent to murder William Thomas. Their motion for a new trial was overruled, and they excepted. The motion contained the general grounds that the verdict was contrary to law, evidence, etc.; an assignment of error on the court's refusal to permit dedefendants' counsel to ask Phillips, a witness for the State, the question quoted in the first head-note; and a ground of newly discovered evidence.

Upon the trial it appeared, from the range of the wound, that Thomas must have been higher than the party who did the shooting. Thomas testified: Ramsey was in his employment up to the last of January, 1891. He could not say positively that he had known Marion, but a short while before he discharged Ramsey he saw a person with Ramsey at witness's fish-house, who, Ramsey informed him, was Marion. Witness started for home a few minutes before ten o'clock on the night of February 7, 1891. He drove up Second avenue until he got to a branch half way between 18th and 19th streets. He lived at the southwest corner of 20th street and Third avenue. Just before reaching the branch he saw two boys on the east side of the street. He stopped his horse to drink at the branch. The two boys walked up on the bridge while the horse was drinking, and stopped and looked right down on witness. It was a dark night, but the electric light was burning. Witness.

continued on his way home, and the boys went the same way he did for part of the distance. He drove to his stable, which is about fifty yards from Second avenue and about half way between Second and Third avenues on 20th street. There is an electric light at the intersection of 20th street and Second avenue. When he stopped at the stable he looked to see if he could see anything of those suspicious characters, and did see them coming around the corner of 20th street and Third avenue, in the direction of his stable. They came up to his buggy, the boy whom he learned to be Marion walking in advance of Ramsey. Witness knew Ramsey at the time, and he came bent half down behind Marion, who stood up straight. Marion walked up within three feet of the buggy and asked witness if he had any money. Witness told him he had none for him, and Marion drew his pistol and said, "Your money or your life." Witness said, "You won't get it," and Marion shot. Only one of them shot and that was Marion, the taller. Ramsey knew where witness lived and had helped him hitch up his horse many times. The boys ran off. Ramsey knew witness frequently carried money on his person; witness had sent hundreds of dollars by him to men with whom he did business, and to the post-office. He was in his buggy, about four feet above the party shooting. He did not recognize the boys at the branch, the electric light on the bridge and sidewalk being obstructed by trees and houses. There were two shots fired, only the first taking effect, the second being fired when they ran off. He did not recognize the voice of Marion, and never once thought it was Marion at the time of the shooting, but knew it was a boy he had seen somewhere, and said that he could not call his name, but if he ever saw him any more, would know him; but he knew Ramsey to a certainty. The electric light is about fifty-five yards

from his stable, and the corner of his residence where he saw the boys coming around is about as far from the stable. He did not say to parties who asked about the shooting, that he did not know who did it, and did not tell Miles so; nor did he tell Sturkey that he did not know who shot him, but thought he knew one of the parties, Elbert Ramsey, nor that a policeman had told him that he (the policeman) had been around and found Ramsey sick in bed just after the shooting, and therefore it could not be Ramsey. Witness's vision is interfered with to some extent, as he has lost the sight of one eye. Ramsey looked as if trying to conceal himself behind the boy who shot, and was trying to hide his face with his hat. There was an electric light at the intersection of 18th street and Second avenue, which was burning on the night in question, and was about seventy-five or eighty yards from the branch. Witness did not tell the father of Ed. Marion that he did not know his boy. Witness could not think what boy it was, could not remember about seeing him at the fish-house, could not remember where, but if anybody had said Ed. Marion, would remember it "that quick." The night he was shot he sent a policeman to Ramsey's house, and was surprised when he came back without arresting him. The reason he did not send a policeman to Marion's house was because he had no idea who he was; did not know it was Ed. Marion, only he would know that boy if he ever saw him any more. There was nothing to obstruct the light shining on the bridge where he watered his horse. The light did not illuminate the sidewalk just before he got to the branch, on account of the shade from the houses and trees.

Laura Ramsey testified for the State: In February, 1891, she lived at the intersection of 20th street and Third avenue on the north corner, and Thomas lived on the south corner. On the night Thomas was shot she

was in bed in her room, in the back room on the south side of her house, when she was disturbed by some loud talking. Heard the conversation between Thomas and the boys, and the shot. About that time she sprang to the door, went on the porch and saw the boy shoot the second shot. She knew one of the boys, Ramsey, and recognized Thomas. After the shooting the boys ran off into Third avenue and then north. Next day the boys under arrest were brought by the gate, and she said, "I know that biggest one did the shooting; that lowest one did not shoot." She knew they were the same boys she saw run off the night before. Did not know Marion from any other colored boy, but recognized them and knew they were the same negro boys. Had seen Ramsey many times before the shooting while he was working for Thomas. Witness lived just across the street, on the corner just north of Thomas's residence and just diagonally across from Thomas's stable. She heard every word of the loud talking; did not see the first shot but saw the second.—A witness testified that he knew Elbert Ramsey, and saw him going up Second avenue that night forty or fifty minutes after ten o'clock and fifteen or twenty minutes after the shooting. Phillips and other witnesses testified to the good character and credibility of William Thomas. Phillips also testified that he went to see Thomas about five minutes after he was shot; that Thomas said he thought he knew one of the parties and had seen the other, but could not locate him, would know if he ever saw him again; that he was a copper-colored boy and the tallest of the boys, the smaller of whom kept behind the taller one, dodging all the time. Another witness who reached Thomas a few minutes after the shooting, was told by Thomas that one of the boys was one that he had in his employ, that he could not at that time locate the other, but if he ever saw him again, would know him.

The defence rested partly upon testimony tending to establish an *alibi* for both defendants, and there was evidence that the first person (Miles) who got to Thomas after he was shot, was told by Thomas that one of the boys shot him, but he did not know who it was, he suspected one of the boys and took him to be Elbert Ramsey who did not do the shooting; that on the next day after he was shot Thomas said in the presence of Sturkey and another that he did not know who did it, thought he knew one of the boys, but was not certain, and the boy he thought did it was lying in bed and said he was sick abed when the policeman went up there, and the policeman had his shoes brought out and they were perfectly dry, and from what the newspaper said (Thomas had been reading the newspaper) no doubt that could not be the boy; that he thought the one he knew was Elbert Ramsey, and he was the one whose house the policeman went to and found in bed sick, etc.; that on the night of the shooting Thomas said to another witness that he did not know who shot him, thought one was Elbert Ramsey, the other one he did not know. The father of defendant Marion testified, among other things, that Thomas told him after his son was arrested: "I don't know your boy, but I think I know one of them; I don't know your boy but I will see if I can find out who it was. The largest one of the two boys did the shooting, but if I come down and swear against them I will try and convict them." He did not say he knew one of the boys was Elbert Ramsey, but said he thought one of them was, and did not say that if he ever saw defendant Marion he would know him. Another witness who was present at the interview between Marion's father and Thomas, testified that Thomas said, "I don't know your boy, but the taller boy did the shooting, and the smaller boy seemed to be dodging behind the taller boy whom I taken to be Elbert Ramsey";

that along towards the last of the conversation Thomas said, "If I swear against him I think I will be able to convict him, and I am going to do all I can to do so"; and that Thomas said he thought the smallest boy was Elbert Ramsey. The mother of Elbert Ramsey testified that Elbert was at home in bed sick when the shooting took place, and that when the policeman came Elbert was in bed, and the policeman asked him how long he had been there and whether he was sick, asked where his shoes were, went and picked them up, and went away without arresting him.

The newly discovered evidence was shown in affidavits by three persons : (1) Deponent has in charge for rent the house situated just across the street and immediately north of Thomas's residence, being the northwest corner of the junction of 20th street and Third avenue. Laura Ramsey did not live in that corner house on February 7, 1891, nor at any other time within the last twelve months preceding July, 1891, but on February 7, 1891, did live at the next house immediately north of said corner house on Third avenue, and the corner house is between the house she lived in and the stable of Thomas, it being impossible for any one in her house to see what occurred at the stable, from either one of the south windows of the house in which she lived, because the party would have to look through the corner house; and no one from either of these windows could see a person run around the corner house from 20th street into Third avenue. (2) Thomas told deponent in a conversation after the shooting, he thought he knew one of the boys who had worked for him, but was not positive, but he did not know or recognize the other boy; and this information was not communicated to any of defendants' counsel until after the trial. Deponent is familiar with the surroundings of the place where the shooting is alleged to have been done, and

there was nothing to obstruct the shining of the electric light at the junction of Second avenue and 18th street on the bridge across the branch, or from shining on the sidewalk on the east side of Second avenue for a distance of thirty yards south of the bridge; if one was standing on the bridge at night when the electric light was burning and was looking down on any one in a buggy or wagon, the horse of which was drinking at the branch, the electric light would shine in their faces and on their persons; and it would be impossible for any one to see the scene of the shooting from the south window of the second house on Third avenue immediately north of the corner house at the northwest corner of 20th street and Third avenue, as the corner house intervened.  (3) Deponent's residence is the northwest corner of 20th street and Third avenue; he lived there when William Thomas was shot; and Laura Ramsey did not reside in or occupy any room in the corner house at any time within the twelve months up to July 13, 1891.

BLANDFORD & GRIMES, LITTLE & WIMBISH and BATTLE & GILBERT, for plaintiff in error.

A. A. CARSON, solicitor-general, J. H. WORRILL and MORGAN MCMICHAEL, *contra.*